UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PEARSALL HOLDINGS, LP,<br>     *Plaintiff,*<br>          *v.*<br>MOUNTAIN HIGH FUNDING, LLC, *et al.*,<br>     *Defendants.* | Civil No. 3:13cv437 (JBA)<br><br>December 10, 2013 |

**RULING ON DEFENDANT RIVIERE'S MOTION TO DISMISS**

On June 20, 2013, Plaintiff Pearsall Holdings, LP filed a Second Amended Complaint [Doc. # 39] against Defendants Mountain High Funding, LLC, Mountain High Finance, LLC (the "Mountain High Defendants"), Charles James Blue, Kevin Lee Day, L. John Lewis, and Robert Riviere, bringing claims for violations of the Connecticut Uniform Securities Act ("CUSA") (Counts One and Two); Intentional Misrepresentation (Count Three); Negligent Misrepresentation (Count Four); Breach of Contract (Count Five); Unjust Enrichment (Count Six); and an Action for Accounting (Count Seven), arising out of an investment Plaintiff made with the Mountain High Defendants. Defendant Riviere now moves [Doc. # 42] pursuant to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6) to dismiss all counts against him, arguing that this Court lacks personal jurisdiction over him, and that Plaintiff has failed to state a claim for which relief can be granted. For the following reasons, the Court concludes it lacks personal jurisdiction over Defendant Riviere and his motion to dismiss is granted.

I.  **Background**

  A.  **Factual Background as Alleged in the Second Amended Complaint**

Plaintiff is an Alaska limited partnership, and David Pearsall, its general partner, is a resident of Roxbury Connecticut. (*See* 2d Am. Compl. ¶ 1.) Defendant Mountain

High Funding, LLC was a Nevada limited liability company located in Salt Lake City, Utah, but its limited liability company status was revoked by the Nevada Secretary of State on April 1, 2011. (*See id.* ¶ 2.) Defendant Mountain High Funding, LLC had three members: KMM Financial Corporation—a Utah corporation with its principal place of business in Utah, Blue Skies Corporation—a Utah corporation with its principal place of business in Utah, and D-Day Corporation—a Utah corporation with its principal place of business in Utah. (*See id.* ¶ 3.) Defendant Mountain High Finance, LLC was a Utah limited liability company, and its members, Defendants Charles James Blue, Ray D. Carter, and Kevin Lee Day,[1] are all residents of Utah. (*See id.* ¶¶ 4–6.) Defendant L. John Lewis is a resident of Utah who purported to act as legal counsel for the Mountain High Defendants. (*See id.* ¶ 7.) Defendant Robert L. Riviere is a resident of Texas. (*See id.* ¶ 8.)

In 2010, Pearsall spoke to one Joseph Miller during a seminar, who informed him that he would be investing in the Mountain High Defendants and advised Pearsall to invest in them as well. (*See id.* ¶ 9–10.) Miller also informed Pearsall that he was working with Blue, Lewis, and Day on a separate commodities trading deal. (*See id.* ¶ 10.) Miller telephonically introduced Pearsall to Defendants Riviere, Lewis, and Blue while Pearsall was in Connecticut. (*See id.* ¶ 11.) None of these defendants are registered to sell securities in the State of Connecticut. (*See id.* ¶ 16.) The individuals on the call explained that the Mountain High Defendants intended to issue a rated life settlement bond based on aggregated viatical settlements via entities controlled by the Mountain High Defendants. (*See id.*) The individuals on the call explained that Defendant Riviere's role

---

[1] In 2011, Kevin Lee Day replaced Ray D. Carter as a member and manager of Defendant Mountain High Finance, LLC. (*See* Second Am. Compl. ¶ 6.)

2

in the transaction was to line up buyers for the bond and represented that a buyer, in addition to back-up buyers, had already been located. (*See id.*) The individuals also emphasized the urgency and necessity of Plaintiff's investment by explaining that Plaintiff would be replacing a current investor in the transaction that needed to withdraw. (*See id.*) Plaintiff does not identify which individuals made which representations on the call, except to allege that Defendant Blue "did most of the talking." (*See id.*) Defendant Riviere avers that he was "patched into" this call while it was already in progress. (*See* Riviere Decl. [Doc. # 44] ¶ 4–5.) He further avers that he never said or suggested that buyers for the bond had been lined up or that he was conducting due diligence, and no one else made such representations while he was on the call. (*See id.* ¶ 5.)

After this initial call, Blue, Lewis, Day, and Riviere made five or six telephone calls over the next four weeks to Pearsall at his home and business in Connecticut, continuing to solicit his investment in the Mountain High Defendants. (*See* 2d Am. Compl. ¶ 13.) The individuals continued to represent that they had buyers in place for the bond and that Riviere had experience with this type of deal. (*See id.* ¶ 14.) The individuals also stated that outside lawyers and investment firms were involved in the deal. (*See id.*) Defendant Riviere avers that he was "patched into" these follow-up calls while they were already in progress, and that he never made nor heard anyone else make the representations that Plaintiff alleges were made to him on these calls. (*See* Riviere Decl. ¶¶ 4–5.) Plaintiff concedes that Defendant Riviere was only on some of these calls and alleges no misrepresentations corresponding to Defendant Riviere's presence on any particular call. (*See id.* ¶ 13.)

Around February 25, 2010, "Defendants" mailed to Plaintiff in Connecticut their Confidential Offering Memorandum (the "Offering Memorandum") detailing the

3

proposed investment. (*See* 2d Am. Compl. ¶ 19.) The Offering Memorandum stated that the Mountain High Defendants had entered into a joint venture with Aliya Companies, LLC to form a company called M&A Funding, LLC, and explained that the Mountain High Defendants had a 67.5% ownership in M&A Funding, LLC. (*See id.* ¶ 20.) It further stated that M&A Funding, LLC had formed Paladin Funding, LLC with Riviere Securities, which is Defendant Riviere's company. (*See id.* ¶ 21.) M&A Funding, LLC owned 80% of Paladin Funding, LLC, and Riviere Securities owned the other 20%. (*See id.*) The Offering Memorandum stated that Paladin Funding, LLC owned Loeg Capital I, LLC—an Irish Qualified Investment Fund—which was the vehicle for issuing the life settlement bonds that were the basis for Plaintiff's investment. (*See id.* ¶ 22.)

The Offering Memorandum also provided several precautionary provisions. It indicated that the investment was being offered only to "accredited investors," and warned that the investment involved "a high degree of risk and should only be considered by those individuals who c[ould] afford the loss of their entire investment." (*See* Offering Memorandum, Ex. A to Quick Decl. [Doc. # 45] at 3.)[2] The Offering Memorandum further provided that "[n]o person is authorized to give any information or to make any representation in connection with this offering other than those contained in this memorandum. Information or representations not contained herein must not be relied on as having been authorized by the company." (*See id.* at 29.)

---

[2] Although Plaintiff did not attach the Offering Memorandum or the Investment Agreement to its Complaint, Plaintiff's counsel stated at oral argument that Plaintiff does not object to the Court's consideration of these documents. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 11 (2d Cir. 2010) ("Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily on its terms and effect, thereby rendering the document integral to the complaint." (internal citations and quotation marks omitted)).

The Offering Memorandum stated that the Mountain High Defendants would pay up to an amount equal to the proposed investment plus a three times return (*see* 2d Am. Compl. ¶ 25), and represented that an investment of $750,000 would entitle Plaintiff to a participation interest of 5% of the net profits following the sale of any bonds in which the Mountain High Defendants had a participation interest (*see id.* ¶ 26.)  Defendant Blue told Pearsall that this could yield as much as $7 million to $9 million.  (*See id.*)  The individuals on the call also represented to Pearsall that Plaintiff would only be out of its $750,000 investment for 45 to 90 days, and that within 45 to 90 days Plaintiff would have received a $3 million return because a buyer for the bond had already been lined up.  (*See id.* ¶ 27.)  Plaintiff alleges that these representations induced Plaintiff to invest in the Mountain High Defendants.  (*See id.* ¶ 29.)

On June 1, 2010, Lewis sent a facsimile to and spoke with Pearsall's attorney at her office in Connecticut to solicit the investment.  (*See id.* ¶ 15.)  On June 3, 2010, Pearsall executed an Investment Agreement on behalf of Plaintiff and made a $750,000 investment in the Mountain High Defendants.  (*See id.* ¶ 30.)  The Investment Agreement provided that Plaintiff "relied upon independent investigations" in deciding to make the investment (Investment Agreement, Ex. B to Quick Decl. at A-3), and that "no representations ha[d] been made to [Plaintiff] concerning the Investment or the Company, its business or prospects or other matters," (*id.* at A-4).  The Investment Agreement also contained a merger clause:

> This Agreement and any exhibits hereto constitute the entire agreement and understanding of the parties hereto with respect to the matters herein set forth, and all prior negotiations, writings, and understandings relating to the subject matter of this Agreement are merged herein and are superseded and canceled by this Agreement.

(*Id.* at A-8.)  On June 4, 2010, Defendant Lewis, on behalf of the Mountain High Defendants, acknowledged and confirmed receipt of the investment and the forthcoming return on the investment.  (*See* 2d Am. Compl. ¶ 31.)  On June 15, 2010, Defendant Blue accepted the investment on behalf of the Mountain High Defendants and signed the Investment Agreement.  (*See id.* ¶ 32.)

Beginning in July 2010, Pearsall would periodically check on the status of the bond sale.  (*See id.* ¶ 34.)  Defendants Blue and Lewis would respond to these requests for updates with emails stating that they were negotiating with buyers for the bond.  (*See id.*)  They also set up calls with Defendant Riviere to describe the sale efforts to Plaintiff, and stated during these calls that buyers were going through due diligence.  (*See id.*)  Defendant Riviere avers that he made no such representations and that no such representations were made while he was on the calls.  (*See* Riviere Decl. ¶ 5.)  Pearsall continued to exchange emails and telephone calls with Defendants throughout 2011 and 2012.  (*See* 2d Am. Compl. ¶ 35.)[3]  In early 2012, after Pearsall complained about the lack of progress, Defendant Blue sent an email to Pearsall assuring him that Defendants were moving forward with the sale of an unrated bond.  (*See id.* ¶ 36.)  On August 17, 2012, Plaintiff sent a letter to "Defendants" demanding an accounting of the investment.  (*See id.* ¶ 40.)  To date, Plaintiff has received no return on its investment nor any payments of its 5% participation interest, and Defendants have refused to provide Plaintiff with an accounting.  (*See id.* ¶¶ 37–39, 41.)

---

[3] However, when Defendant Mountain High Funding, LLC's status was revoked by the Nevada Secretary of State in April 2011, no one informed Pearsall of this fact.  (*See* 2d Am. Compl. ¶ 35.)

      **B.**    **Procedural Background**

On February 28, 2013, Plaintiff commenced this action against Defendants in the Connecticut Superior Court for the Judicial District of Litchfield. (*See* Compl., Ex. B to Notice of Removal [Doc. # 1].) On April 1, 2013, Defendants timely removed the action to federal court. On May 1, 2013, Plaintiff filed an Amended Complaint [Doc. # 29]. On May 30, 2013, the Court held a pre-filing conference to identify potential grounds for Defendant Riviere's pending motion to dismiss, during which the Court granted leave for Plaintiff to file a Second Amended Complaint in anticipation of those issues. The Court also scheduled limited written discovery regarding the jurisdictional issues in the case. (*See* Scheduling Order [Doc. # 38].) Deposition discovery was stayed until a ruling on Defendant Riviere's pending motion to dismiss issued. (*See id.*)[4]

**II.**    **Discussion**

Defendant Riviere is named in Counts One, Three, Four, Six, and Seven of the Second Amended Complaint. He moves to dismiss each of these counts pursuant to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6), arguing that the Court lacks personal jurisdiction over him, and that Plaintiff has failed to state a claim for which relief can be granted.[5]

---

[4] On July 12, 2013, counsel for the Mountain High Defendants, and for Defendants Blue, Day, and Lewis moved [Doc. # 40] to withdraw from the case. The Court granted [Doc. # 54] the motion to withdraw on September 18, 2013. To date, there have been no appearances filed on behalf of these defendants. On October 8, 2013 Plaintiff moved [Doc. # 55] for Default Entry against these defendants, which was granted [Doc. # 56] for failure to appear on October 10, 2013. Plaintiff's subsequent motion [Doc. # 63] for Default Judgment against each of these defendants, with the exception of Defendant Blue, whom Plaintiff avers is subject to an automatic bankruptcy stay, remains pending.

[5] Because this Court concludes that it lacks personal jurisdiction over Defendant Riviere, it will not address his arguments under Rule 12(b)(6).

7

When deciding a motion to dismiss for lack of personal jurisdiction, the Court conducts a two-part analysis. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002). First, the Court applies Connecticut's long-arm statute. *Id.* If the Court finds that the long-arm statute applies, the Court must then decide whether the exercise of jurisdiction over the defendant comports with the constitutional requirements of due process. *Id.* "When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *Id.* at 784. When a court does not conduct a "full-blown evidentiary hearing" on the motion, the plaintiff need only make out "a prima facie showing that the court possesses personal jurisdiction over the defendant." *DiStefano v. Carozzi North America, Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)). Such a showing must be made by alleging facts, not simply conclusions, but the Court "construe[s] jurisdictional allegations liberally and takes as true uncontroverted factual allegations." *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) (internal citations omitted). Defendant Riviere argues that an exercise of personal jurisdiction in this case would comport with neither the Connecticut long-arm statute, nor the constitutional requirements of due process.

### A. Long-Arm Statute

The Connecticut long-arm statute governing jurisdiction over foreign individuals provides, in pertinent part, that "a court may exercise personal jurisdiction over any nonresident individual . . . who in person or through an agent: (1) [t]ransacts any business within the state; [or] (2) commits a tortious act within the state . . . ." Conn. Gen. Stat. § 52-59b(a). Plaintiff claims that Defendant Riviere's conduct in failing to

8

correct telephonic misrepresentations by other defendants in connection with the investment at issue in this case constitutes both the transaction of business within the state and the commission of a tortious act within the state.

        1.      *Transacts Business Within the State*

Pursuant to § 52-59b(a)(1), a Connecticut court may exercise personal jurisdiction over a defendant that transacts any business in this state. Although the phrase "transacts any business" in § 52-59b(a)(1) is not defined, the Connecticut Supreme Court has construed the term to embrace even "a single purposeful business transaction." *Zartolas v. Nisenfeld*, 184 Conn. 471, 474 (1981). "A purposeful business transaction is one in which the defendant has engaged in some form of affirmative conduct allowing or promoting the transaction of business within the forum state." *Nusbaum & Parrino, P.C. v. Collazo De Colon*, 618 F. Supp. 2d 156, 162 (D. Conn. 2009) (quoting *Health Communs., Inc. v. Chicken Soup for the Soul Publ'g, LLC*, No. X06CV084014539S, 2009 WL 579227, *22 (Conn. Super. Ct. Feb. 9, 2009)). "Moreover, a nonresident individual who has not entered this state physically nevertheless may be subject to jurisdiction in this state under § 52–59b(a)(1) if that individual has invoked the benefits and protection of Connecticut's laws by virtue of his or her 'purposeful Connecticut related activity.'" *Ryan v. Cerullo*, 282 Conn. 109, 120 (2007) (internal citations and quotation marks omitted). If a defendant is found to have transacted business in Connecticut, the cause of action against the defendant must arise from its business activity in this state. *See id.* at 121–22.

Defendant Riviere avers that he has never lived in or visited Connecticut, has never owned property in Connecticut, has never conducted or solicited business in Connecticut, has no clients in Connecticut, and has never derived any revenue from

9

Connecticut. (*See* Riviere Decl. ¶ 2.) He further states that his only involvement in the transaction at issue in this case was to provide marketing services to the Mountain High Defendants for the bond, and that because the other defendants were never able to structure the bond, neither he nor his company received any money from Plaintiff or the Mountain High Defendants and derived no profit from Plaintiff's investment. (*See id.* ¶ 3.) Defendant Riviere claims that his only contact with Pearsall occurred during two or three phone calls during which Defendant Riviere was patched into calls that were already in progress. (*See id.* ¶¶ 4–5.) Defendant Riviere avers that he never made any representations that a buyer was lined up or that he was conducting due diligence, and that he never heard anyone else make such representations while he was on the calls. (*See id.* ¶ 5.) Thus, because his only connection to Connecticut consisted of a handful of phone calls, he maintains that has never transacted business in Connecticut and no long-arm jurisdiction over him exists under § 52-59b(a)(1).

"[T]he transmission of communications between an out-of-state defendant and a [party] within the jurisdiction does not, by itself, constitute the transaction of business within the forum state." *Mitchell v. Patterson*, No. 4001501, 2005 WL 1671528, at *7 (Conn. Super. Ct. June 21, 2005) (internal citations and quotation marks omitted) (collecting cases); *see also Martinez v. Yavorcik*, 455 F. Supp. 2d 115, 121 (D. Conn. 2006) ("[C]ourts have in other cases found that minimal contacts with Connecticut by a nonresident defendant, such as mail, phone, and fax communications, occasional visits, and even *pro hac vice* admission to Connecticut courts will not constitute the transaction of business within the state."). For example, in *Mitchell*, the court concluded that it lacked personal jurisdiction over the defendants where the only purposeful acts the defendants engaged in in Connecticut were three faxes or e-mails sent to the plaintiffs

regarding contractual services the defendants would provide in North Carolina. Similarly, in *Harris v. Wells*, 832 F. Supp. 31 (D. Conn. 1993), where the defendant merely had some telephone conversations with the plaintiff in Connecticut regarding a litigation agreement that was not prepared, negotiated, or executed in Connecticut, the defendant had not engaged in a single purposeful business transaction in Connecticut. *Id.* at 34. *See also Martinez*, 435 F. Supp. 2d at 120–122 (attorneys' communications with individuals in Connecticut regarding an ongoing attorney-client relationship with Ohio residents did not constitute the transaction of business in Connecticut); *Greene v. Sha-na-na*, 637 F. Supp. 591, 596 (D. Conn. 1986) (a telephone call, telegram, and letter sent by the defendants to the plaintiff in Connecticut regarding their out-of-state partnership agreement was insufficient to constitute the transaction of business in Connecticut).

Plaintiff argues that these cases are inapposite because Defendant Riviere actively marketed the bond for the other defendants, as illustrated by his email correspondence with them regarding his attempts to secure a buyer. (*See, e.g.*, Ex. 1 to Miller Decl. [Doc. # 58-2] at RR0000885–887, RR0000894.)  Plaintiff also alleges that Defendant Riviere participated in the calls to Pearsall "to help pitch Pearsall Holdings, to provide assurances that he was marketing the bond, and to try to obtain Pearsall Holdings' investment." (*See* Pl.'s Opp'n [Doc. # 58] at 9 (citing Pearsall Aff., Ex. A to Pl.'s Opp'n ¶¶ 6–12).)  Thus, Plaintiff reaaons that this case is more akin to the circumstances of *Under Par Assocs., LLC v. Wash Depot A., Inc.*, 47 Conn. Supp. 319 (2001), in which the defendant was alleged to have participated in telephonic negotiations with the plaintiff in Connecticut regarding the sale of real property located in Connecticut during which time he allegedly made several material misrepresentations. *Id.* 320–21. The court held that the defendant had "participated in the business negotiation in the forum state," *id.* at 322, "well beyond

11

the situation where a defendant merely telephones a single order from outside the State," *id.* (internal citations and quotation marks omitted). The defendant had purposefully availed himself of the benefits of transacting business in Connecticut such that an exercise of personal jurisdiction was appropriate. *Id.* at 322–23.

However, none of the allegations in the Second Amended Complaint or the Pearsall Affidavit contradict Defendant Riviere's statement that he merely joined a handful of calls with Plaintiff that were already in progress. In the Second Amended Complaint and the Pearsall Affidavit, Plaintiff gives no particularity as to which calls Defendant Riviere joined, when those calls took place, whether Defendant Riviere was present when any of the alleged misrepresentations were made and does not attribute any affirmative misrepresentation to Defendant Riviere. Nor has Plaintiff disputed Defendant Riviere's representation that he has no other connections to this state.[6] Unlike the defendant in *Under Par*, Defendant Riviere did not enter into a contractual relationship with Plaintiff and did not negotiate a transaction during the telephone calls with Plaintiff. Further, unlike *Under Par*, the subject of the underlying transaction at issue in this case was not the sale of real property in Connecticut, but rather an investment governed by a contract with a Utah choice-of-law provision. (*See* Investment Agreement at A-7.)

---

[6] Plaintiff has identified two emails that were exchanged between Plaintiff and Defendant Riviere, as well as the other defendants. (*See* Ex. 1 to Mitchell Decl. at RR0000485, RR0000489.) The first is an email from the Mountain High Defendants setting up a conference call with Defendant Riviere, and the second is Defendant Riviere's reply stating that he will be available for the call. (*See id.*) However, both emails were sent in January 2011, six months after Plaintiff made the Investment with the Mountain High Defendants and his claims had accrued. Therefore, these emails are not relevant to the jurisdictional analysis. *See Back9 Network, Inc. v. Altounian,* No. 3:12-CV-00582 (JCH), 2013 WL 996598, at *3 (D. Conn. Mar. 13, 2013) (refusing to consider actions that post-dated the accrual of the plaintiff's claim in deciding a motion to dismiss for lack of personal jurisdiction). As well, they do not contradict Defendant Riviere's representations that he only attended a handful of conference calls with Plaintiff.

Finally, Plaintiff argues that the emails exchanged between Defendant Riviere and the other defendants, in addition to his presence on the calls with Plaintiff establish that Defendant Riviere provided "material assistance" to an "offer to sell" securities in Connecticut within the meaning of the CUSA and that he therefore transacted business within the state for the purposes of § 52-59b(a)(1). However, Plaintiff offers no case law in support of this argument. Further, even if Defendant Riviere did provide material assistance to an offer to sell securities, the only Connecticut-related assistance that he provided was to join a handful of conference calls with Plaintiff. Defendant Riviere has never been to Connecticut, has no other business in Connecticut, derives no profit from Connecticut, never entered into a contractual relationship with Plaintiff in Connecticut and had no other contact with this state outside of the phone calls described above, which related to a transaction governed by Utah law. Plaintiff has not even alleged that Defendant Riviere knew Plaintiff was located in Connecticut when these calls were made. Plaintiff is an Alaska limited partnership and because the calls did not originate from Plaintiff in Connecticut, Defendant Riviere would not have seen a Connecticut area code on the caller ID for the conference calls he joined, and the emails described in footnote six give no indication of Plaintiff's presence in Connecticut. Thus, there is no basis for the Court to infer that Defendant Riviere knew he was materially assisting an offer to sell securities *in Connecticut* if he did materially assist such an offer. Therefore, Defendant Riviere did not "transact business within the state" for the purposes of § 52-59b(a)(1).

    2.    *Commits a Tortious Act Within the State*

Plaintiff also alleges that this Court has personal jurisdiction over Defendant Riviere pursuant to § 52-59b(a)(2) because he engaged in tortious conduct within the state. The Connecticut Supreme Court has not addressed the issue of whether a

13

nonresident who sends oral and written misrepresentations into Connecticut commits a tort "within the State" for the purposes of § 52-59b(a)(2). Defendant Riviere urges this Court to follow the approach of New York courts in interpreting the New York statute that was the model for § 52-59b and conclude that an individual must be present in the state when the misrepresentation is made for jurisdiction to attach. (*See* Def.'s Reply [Doc. # 62] at 4 n.6.) However, the weight of authority holds that "[i]t is well-established that false or fraudulent misrepresentations transmitted to Connecticut by mail, wire[,] or telephone constitute 'tortious conduct in Connecticut sufficient to establish personal jurisdiction under Connecticut's long-arm statute.'" *Vertrue Inc. v. Meshkin*, 429 F. Supp. 2d 479, 492 (D. Conn. 2006) (internal citations omitted). For example, in *Cody v. Ward*, 954 F. Supp. 43 (D. Conn. 1997), the court concluded in the context of a CUSA claim that where a nonresident defendant directed fraudulent misrepresentations to the plaintiff in Connecticut via phone, email, and online message boards inducing the plaintiff to purchase securities, these allegations were sufficient to support a finding of personal jurisdiction under § 52-59b(a)(2). *Id.* at 45–46; *see also Back9 Network, Inc. v. Altounian*, No. 3:12-CV-00582 (JCH), 2013 WL 996598, at *3–4 (D. Conn. Mar. 13, 2013) (holding that the court had jurisdiction pursuant to § 52-59b(a)(2) where the nonresident defendant had addressed misrepresentations from outside the state to the plaintiff in Connecticut via email, text message, and telephone).

Defendant points to two Connecticut cases concluding that when the plaintiff initiated the call in which the alleged misrepresentation was transmitted, personal jurisdiction under § 52-59b(a)(2) was not established. In *Swain v. American Capital Strategies, Ltd.*, No. X04CV030103924S, 2004 WL 1966013 (Conn. Super. Ct. Aug. 4, 2004), the basis for the plaintiff's claims was statements made during an out-of-state

board meeting which Plaintiff joined via telephone from Connecticut. The court held that the determinative factor for evaluating whether this call constituted a tort committed within the state was "whether the alleged tortious conduct was directly and expressly targeted at the forum state." *Id.* a *8. Because the plaintiff had initiated the call to the defendants, the court determined that the defendants had not targeted Connecticut with their statements and that the alleged tortious conduct had not occurred in Connecticut for the purposes of §52-59b(a)(1). *Id.* Similarly, in *Dime Bank v. Merrill Lynch*, No. X05CV094017091S, 2010 WL 760441 (Conn. Super. Ct. Jan. 15, 2010), the court determined that it lacked personal jurisdiction over an individual defendant pursuant to § 52-57b(a)(1) where the only alleged misrepresentations the defendant had made occurred during a call the defendant had received from the plaintiff during which he responded to the questions posed or were contained in presentation materials that were later transmitted to the plaintiff by other defendants. *Id.* at *12.

Here, as in *Dime Bank* and *Swain*, the only alleged misrepresentations occurred during conference calls that Defendant Riviere did not initiate and in which he responded to questions. The closest Plaintiff comes to alleging that Defendant Riviere committed any tortious conduct targeted to Connecticut is that "each of the Defendants made additional assurances that there was a buyer for the bond already lined up, and that there were other investors." (Pearsall Decl. ¶ 12.) Even disregarding Defendant Riviere's sworn statement and accepting Plaintiff's general allegations that "individuals" made misrepresentations during the phone calls, Plaintiff has not alleged that Defendant Riviere acted in any particular manner to direct his statements to Connecticut, or that he even knew that anyone from Connecticut was on the calls. Therefore, the Court concludes that it lacks personal jurisdiction under § 52-59b(a)(2).

### B. Due Process

Specific personal jurisdiction may be exercised if the foreign defendant has purposefully established significant contact with the forum state and the plaintiff's cause of action arises out of or is related to the defendant's forum contacts. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 486 (1985); *Metro. Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 568 (2d Cir. 1996). In order to determine that the requisite minimum contacts exist, "it is essential in each case that there be some act by which the defendant *purposefully avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of the laws." *Bensmiller v. E.I. Dupont de Nemours & Co.,* 47 F.3d 79, 84–85 (2d Cir. 1995) (emphasis in original) (quoting *Hanson v. Denckla,* 357 U.S. 235, 254 (1958)). "This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Burger King Corp.*, 471 U.S. at 475 (internal citations and quotation marks omitted). "Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State." *Id.* (emphasis in original).

Plaintiff argues that its allegations that Defendants made material misrepresentations during phone calls to Pearsall in Connecticut in order to induce Plaintiff to invest with the Mountain High Defendants suffice to show that Defendant Riviere has purposefully availed himself of the benefits of this state's laws. In *Cody*, the district court concluded that because the defendant affirmatively made material representations to the plaintiff in Connecticut in a series of emails and telephone calls to induce the plaintiff to purchase securities, "he should reasonably have anticipated being

sued here." 954 F. Supp. at 47; *see also Center Capital Corp. v. Hall*, CV 92-0452084S, 1993 WL 214614, at *5 (Conn. Super. Ct. June 9, 1993) ("One who causes fraudulent misrepresentations to be communicated to Connecticut, either in person or through their agent, in order to induce a Connecticut corporation to act thereon, cannot claim surprise when called upon to answer in a Connecticut court.")

However, the record shows no purposeful conduct by Defendant Riviere directed toward Connecticut, and it would be unfair to subject him to personal jurisdiction in this state. In *Margolis v. Gilliam*, No. CV94-0363504, 1995 WL 94548 (Conn. Super. Ct. Feb. 22, 1995), the nonresident defendants were alleged to have made defamatory statements to the plaintiff's future employer when contacted by that prospective employer and asked about the plaintiff's employment history, such that they tortiously interfered with the plaintiff's business expectancy. *Id.* at *1. The court concluded that unlike cases where defendants purposely addressed fraudulent communications to Connecticut, the defendants "merely received a telephone call during which they responded to inquiries concerning the plaintiff" and such conduct did not represent purposeful activity directed toward Connecticut. *Id.* at *5.

Defendant Riviere never contacted Plaintiff directly in Connecticut, he has no other contacts with this state, he never entered into an ongoing contractual relationship with Plaintiff, and the subject of the misrepresentation was unrelated to Connecticut. He communicated with Plaintiff regarding a potential investment with the nonresident Mountain High Defendants that would be governed by Utah law, and there is nothing in the record before the Court to support an inference that Defendant Riviere even knew that Pearsall was in Connecticut during the phone calls in question. Without such knowledge, Defendant Riviere's alleged conduct cannot represent a purposeful availment

17

of the benefits and privileges of Connecticut laws such that he should have anticipated being sued in this jurisdiction.  *See, e.g.*, *Grunberger Jewelers v. Leone*, No. Civ. A 303CV647 (CFD), 2004 WL 1393608, at *4 (D. Conn. June 18, 2004) ("Considering the totality of the circumstances—which include that the telephone negotiations between Leone and Grunberger were part of negotiations with all three plaintiffs, two of whom were in Illinois with Leone, and that the subject of the negotiation was the sale of a metals testing machine to be used not in Connecticut but in West Africa—the Court concludes that the two phone calls from Leone's office to Grunberger in Connecticut, and his participation in them, did not constitute a connection with the forum state such that Leone should have reasonably anticipated being haled into court in Connecticut." (internal citations and quotation marks omitted)); *Harris*, 832 F. Supp. at 35 ("[The defendant] did not purposefully direct his activities to residents of Connecticut.  He executed a joint litigation agreement outside of Connecticut which related to actions and parties in several jurisdictions.  He had some telephone conversations with Wells.  This was his only direct contact with any resident of Connecticut.  Based on these limited contacts, [the defendant] should not have anticipated that he would be haled into a Connecticut court.").  Even if this Court were to have personal jurisdiction under the Connecticut long-arm statute, the exercise of such jurisdiction would not comport with the constitutional requirements of due process.[7]

---

[7] In their briefing, the parties confine their discussion of due process to the "minimum contacts" test, and neither party addresses the reasonableness analysis that represents the second step of evaluating due process.  Because the Court concludes that Defendant Riviere lacks the requisite minimum contacts with Connecticut for an exercise of personal jurisdiction over him to comport with due process, it will not address the reasonableness factors.

### III. Conclusion

For the foregoing reasons, Defendant Riviere's Motion [Doc. # 42] to Dismiss is GRANTED for lack of personal jurisdiction.  The clerk is directed to dismiss Defendant Riviere from this action.

                                  IT IS SO ORDERED.

                                  /s/
                              Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 10th day of December, 2013.