UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PEARSALL HOLDINGS, LP,<br>    *Plaintiff,*<br>       *v.*<br>MOUTAIN HIGH FUNDING, LLC, MOUNTAIN<br>HIGH FINANCE, LLC, CHARLES JAMES BLUE,<br>KEVIN LEE DAY, L. JOHN LEWIS, and ROBERT L.<br>RIVIERE,<br>       *Defendants.* | Civil No. 3:13cv437 (JBA)<br><br><br>December 18, 2014 |

**RULING ON DEFENDANTS' MOTION TO DISMISS**

Plaintiff Pearsall Holdings, LP ("Pearsall") brings this action in diversity against Defendants Mountain High Funding, LLC and Mountain High Finance, LLC (collectively, "Mountain High")[1], as well as Defendants Charles James Blue[2], Kevin Lee Day[3], L. John Lewis and Robert L. Riviere[4] alleging violations of the Connecticut Uniform Securities Act ("CUSA"), C.G.S. § 36b-29; fraudulent and negligent misrepresentation; and unjust enrichment, and Plaintiff sees an accounting.  Defendant L. John Lewis now moves [Doc. # 87] to dismiss the claims against him under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  Oral arguments were held on December 1, 2014.  For the following reasons, Defendant Lewis's motion to dismiss is granted.

---

[1] Default judgment entered [Doc. # 82] against Defendants Mountain High Finance and  Mountain High Funding on August 7, 2014.

[2] Defendant Blue is currently in bankruptcy proceedings.

[3] Default judgment entered [Doc. # 82] against Defendant Kevin Lee Day on August 7, 2014.

[4] Defendant Riviere has been dismissed [Doc. # 67] from the suit for lack of personal jurisdiction.

I.    **Background**

In 2010, Plaintiff's general partner, David Pearsall met an individual named Joseph Miller at a seminar.  (2d Am. Compl. ¶ 9 [Doc. # 39].)  Mr. Miller, who suggested that Mr. Pearsall invest in Mountain High, introduced Mr. Pearsall to Defendants Riviere, Lewis and Blue via telephone conference.  (*Id.* ¶¶ 10–11.)  During the call, the three defendants "explained that Mountain High had entered into agreements with aggregators of viatical settlements[5] that would be sold by entities controlled by Mountain High through a rated life settlement bond."  (*Id.* ¶ 11.)  According to Mr. Blue, Mr. Lewis and Mr. Riviere, Mountain High had already "lined up" a buyer to purchase a life settlement bond and had backup buyers in case anything went wrong.  (*Id.*)  Although Mr. Blue did the majority of the talking on this call, neither Mr. Blue nor Mr. Lewis corrected or challenged anything he said.  (*Id.*)

Over the course of the next month, Mr. Pearsall spoke with Mr. Blue and Mr. Lewis over the phone five or six more times.  (*Id.* ¶ 13.)  During these calls, Mr. Blue and Mr. Lewis continued to assure Mr. Pearsall that "they had a buyer and backup buyers for the bond in place, as well as other investors."  (*Id.* ¶ 14.)  Additionally, they "represented that Lewis was an attorney, that he and other outside attorneys from Vedder Price were working on the deal, that Oppenheimer was involved, and that [they and] especially

---

[5] "A viatical settlement allows you to invest in another person's life insurance policy.  With a viatical settlement, you purchase the policy (or part of it) at a price that is less than the death benefit of the policy.  When the seller dies, you collect the death benefit."    U.S. Securities and Exchange Commission, "Viatical Settlements," http://www.sec.gov/answers/viaticalsettle.htm (accessed Nov. 17, 2014).

Riviere had experience with these deals." (*Id.*)  Mr. Pearsall later learned however that

"the previous deal"[6] never closed.  (*Id.*)

On approximately February 25, 2010, Defendants sent Plaintiff a Confidential

Offering Memorandum ("Offering Memo") which detailed the expected investment

returns and risk factors and provided an overview of the life settlement industry.  (*Id.*

¶ 19; *see* Offering Mem., Ex. B to Wright Decl. [Doc. # 87-3].)[7]  Defendants Lewis, Blue,

Day, and Riviere subsequently reiterated to Mr. Pearsall that they had already secured a

buyer and backup buyers "and that as a result, Pearsall Holdings would only be out its

$750,000 for 45 to 90 days." (2d Am. Compl. ¶ 27.)  They assured him that in 45 to 90

days, Pearsall Holdings "would have $3 million." (*Id.*)  On June 1, 2010, Defendant Lewis

communicated with Mr. Pearsall's attorney "in order to provide information and solicit

the investment." (*Id.* ¶ 15.)  On or about June 3, 2010, Mr. Pearsall executed the

Investment Agreement ("Agreement") on behalf of Pearsall Holdings and invested

$750,000 in Mountain High.  (*Id.* ¶ 30.)  Defendant Lewis confirmed receipt of the

---

[6] Plaintiff clarified at oral argument that Mr. Riviere had represented to Mr. Pearsall that he had negotiated a similar type of deal but that after investing, Plaintiff discovered that Mr. Riviere had not closed that deal.

[7] Although Plaintiff did not attach the Offering Memo or Investment Agreement to the SAC, the Court can consider them here because a complaint is "deemed to include . . . any statements or documents incorporated in it by reference," even if now not incorporated by reference but on which the complaint relies.  *Holloway v. King,* 161 F. App'x 122, 124 (2d Cir. 2005) (quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir. 2002)) (internal quotation marks omitted).  Plaintiff's SAC relies upon, directly quotes from, and paraphrases both the Offering Memo and the Investment Agreement. Therefore, consideration of their contents is proper, as agreed by Plaintiff at oral argument.

investment around June 4, 2010 (*id.* ¶ 31), and Mountain High accepted the investment about June 15, 2010 (*id.* ¶ 32).

Although the investment was accepted, from July 2010 until early 2012, Mr. Pearsall repeatedly communicated with Mr. Lewis and Mr. Blue regarding the status of the bond sale. (*See id.* ¶¶ 34–36.) Mr. Blue and Mr. Lewis "sent emails claiming that they were negotiating with buyers other than the buyers they said they had lined up before the investment" and later told Mr. Pearsall that "the buyers were going through due diligence" and then that Mr. Riviere "was not trying hard enough to sell the bond." (*Id.* ¶ 34.) Defendants also failed to inform Plaintiff that "Mountain High Funding's status was revoked by the Utah Secretary of State in April 2011" such that Plaintiff's investment was in "an entity that no longer existed." (*Id.* ¶ 35.)

On or about August 17, 2012, Plaintiff demanded an accounting from Mr. Lewis, Mr. Blue, Mr. Day, and Mr. Riviere as well as the return of its investment, interest and its legal fees. (*Id.* ¶ 40.) Defendants have not complied with any of these demands. (*Id.* ¶ 41.) Accordingly, on February 28, 2013, Plaintiff filed suit in Connecticut state court. (*See* Summons and Compl., Ex. B to Notice of Removal [Doc. # 1].) Defendants removed the action to federal court on April 1, 2013. (*See id.*)

## II. Jurisdiction

The Court has diversity jurisdiction over this suit. Plaintiff is a limited partnership registered in Alaska. (2d Am. Compl. ¶ 1). Plaintiff's general partner, David Pearsall, resides in Connecticut. (*Id.*) Defendant Mountain High Funding was a Nevada limited liability company whose "status" was revoked by the Nevada Secretary of State in April 2011. (*Id.* ¶ 2.) It had three members, each a Utah corporation with a principal

place of business in Utah.  (*Id.* ¶ 3.)  Defendant Mountain High Finance was a Utah-based limited liability company which "expired on March 27, 2012."  (*Id.* ¶ 4.)  It had two members, both of whom reside in Utah.  (*Id.* ¶ 5.)  Defendants Charles James Blue, manager of Mountain High Funding and Mountain High Finance, Kevin Lee Day, member and manager of Mountain High Finance, and L. John Lewis, who Plaintiff alleges purported to act as legal counsel for Mountain High, all reside in Utah.  (*Id.* ¶¶ 5–7.) Defendant Robert L. Riviere resides in Texas.  (*Id.* ¶ 8.)  The amount in controversy, more than $750,000, exceeds the statutorily required minimum for diversity cases.  (*See id.* Demand for Relief.)

### III.   Discussion

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* Conclusory allegations are not sufficient.  *Id.* at 678–79; *see also* Fed. R. Civ. P. 12(b)(6).

In addition, plaintiffs alleging fraud or mistake must "satisfy the heightened pleading requirements . . . under Rule 9(b) of the Federal Rules of Civil Procedure," *AllGood Entm't, Inc. v. Dileo Entm't & Touring, Inc.*, 726 F. Supp. 2d 307, 322 (S.D.N.Y. 2010), which require the plaintiff to "state with particularity the circumstances constituting fraud or mistake," *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054–55 (9th Cir. 2011) (internal quotation marks and brackets omitted).  "To

satisfy [the rule], a pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Id.* (internal quotation marks and brackets omitted).  Further, the pleading must "allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995).

Plaintiff alleges that Defendant Lewis is liable for violations of CUSA, § 36b-29a (Count One) and § 36b-29c (Count Two), fraudulent misrepresentation (Count Three), negligent misrepresentation (Count Four), and unjust enrichment (Count Six).   In addition, Plaintiff seeks an accounting (Count Seven) from Defendant Lewis.

Defendant asserts (*see* Mem. Supp. Mot. to Dismiss [Doc. # 87-4] at 7), and Plaintiff does not appear to dispute (*see* Opp'n to Mot. to Dismiss [Doc. # 88] at 22), that Counts One, Three, and Four are subject to Rule 9(b)'s heightened pleading standards. As this contention appears to be undisputed and is in accord with the caselaw in this Circuit, the Court will apply Rule 9(b) to those counts.  *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("[The] wording [of Rule 9(b)] is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."); *Fisher v. APP Pharm., LLC*, 783 F. Supp. 2d 424, 433 n.8 (S.D.N.Y. 2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York*, 375 F.3d 168, 186–87 (2d Cir. 2004)) ("The particularity requirement of Federal Rule 9(b) applies to state law claims of fraud."); *IM Partners v. Debit Direct Ltd.*, 394 F. Supp. 2d 503, 518 (D. Conn. 2005) (applying Rule 9(b) to CUSA fraud claims); *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 254–55 (S.D.N.Y. 2011) ("The Second Circuit has not explicitly ruled on whether [negligent

misrepresentation] claims must satisfy Rule 9(b) [but the Second Circuit has noted that] a number of district courts in this Circuit have required negligent misrepresentation claims to satisfy Rule 9(b)."); *DeBlasio v. Merrill Lynch & Co.*, No. 07CIV318 (RJS), 2009 WL 2242605, at *11 (S.D.N.Y. July 27, 2009) ("To the extent any of Plaintiffs' claims are premised on fraudulent conduct, the facts alleging that conduct are subjected to the higher pleading standard of Rule 9(b). . . . Plaintiffs' [negligent misrepresentation] claim[] incorporates by reference all of the allegations in the [complaint] and is predicated on their allegations of affirmative representations by Defendants.  [Because] the complaint incorporates by reference prior allegations of fraud into other claims traditionally not perceived to be grounded in fraud, those claims must . . .  be pleaded according to Rule 9(b)." (internal quotation marks, citations, and brackets omitted)).

### A.  Preliminary Matters

#### 1.  Choice of Law

As a preliminary matter, there appears to be some dispute between the parties regarding which state's law is applicable here.  Although in his Motion to Dismiss, Defendant applies Connecticut law, in his Reply, he argues for the first time that Utah law controls.  (Reply [Doc. # 89] at 1–4.)  The Court will nonetheless apply Connecticut law because, in addition to the fact that Local Rule 7(d) requires that Reply briefs "be strictly confined to a discussion of matters raised by the responsive brief," *see* D. Conn. L. Civ. R. 7(d), Defendant's argument lacks merit.

A federal court sitting in diversity, as this Court is, must apply the choice-of-law rules of the forum state.  *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496–97 (1941).  Under Connecticut choice-of-law rules, contractual choice-of-law provisions will

be given effect unless either: "a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue." *Elgar v. Elgar*, 238 Conn. 839, 848–50 (1996).  Choice of law provisions "are, however, limited in scope by their terms."  *Benefit Concepts New York, Inc. v. New England Life Ins. Co.*, No. 3:03CV1456 (DJS), 2004 WL 1737452, at *3 (D. Conn. July 30, 2004).  "Connecticut courts . . . distinguish[] between provisions that govern controversies 'arising out of or relating to' a contract, and those contracts that are 'governed by and construed in accordance with' the laws of a state.  The latter type of contract is deemed too narrow to apply to tort claims related to the contract."  *Id.* (internal citations omitted).

In this case, the Agreement unequivocally states: "Governing Law: This Agreement shall be deemed made in the State of Utah for purposes of interpretation and enforcement without regard to conflicts of law."  (Investment Agreement, Ex. B to Wright Decl. at A-8.)  Defendant Lewis contends that the effect of this clause is to foreclose Plaintiff's CUSA claims by requiring application of Utah law and not Connecticut law. (Reply at 1.)

This argument reflects a misunderstanding of CUSA's scope.  CUSA applies "to persons who sell or offer to sell when an offer to sell is made in [Connecticut]."  C.G.S. § 36b-33(a).  Even if the agreement is deemed to have been made (i.e. accepted) in Utah, CUSA applies so long as there was an offer in Connecticut.  The term "offer" or "offer to sell" as used in CUSA "includes every attempt or offer to dispose of, or solicitation of an

8

offer to buy, a security or interest in security for value." C.G.S. § 36b-3(16)(B). "[A]n offer to sell . . . is made in [Connecticut], whether or not either party is then present in [Connecticut], when the offer . . . is directed by the offeror to [Connecticut] and received at the place to which it is directed or any post office in [Connecticut] in the case of a mailed offer." C.G.S. § 36b-33(c). Thus, whether the Offering Memo, mailed to Plaintiff in Connecticut (*see* 2d Am. Compl. ¶ 19), was a solicitation to make an offer as Defendant Lewis argues (*see* Mem. Supp. at 12)[8], or an offer as Plaintiff urges (Opp'n at 8–9), the Agreement is covered by CUSA.

Even if the Agreement could be read to apply Utah law to the exclusion of Plaintiff's CUSA claims, application of Utah law would be inappropriate as it "would be contrary to a fundamental policy of [Connecticut], a state which has a materially greater interest than the chosen state in the determination of [this] issue," *Elgar*, 238 Conn. at 850. CUSA, which was "designed for the protection of Connecticut investors," "reflects

---

[8] In his Reply and at oral argument, Defendant Lewis argued that, contrary to his statements in his Memorandum in Support of the Motion to Dismiss (Mem. Supp. at 12 ("The [Offering] Memorandum was basically an invitation to make an offer to invest in the company which could be accepted or declined by Mountain High" (citing *Lane v. Hopfeld*, 160 Conn. 53, 57–58 (1970) in which the court held that the defendant's advertisements, brochures and price lists were considered "solicitation for an offer and not an offer"))), the Offering Memorandum was in fact not a solicitation to make an offer (Reply at 1–3). This argument is unpersuasive as it contradicts Defendant's own prior statements about the nature of the Offering Memo as well as the language in the Memo itself. While the Memo purports not to be "an offer to sell or an invitation or solicitation of an offer," just two pages prior to that statement, the Memo declares: "This Memorandum constitutes an offer to sell or the solicitation of an offer to purchase only if a duly authorized representative of the Company inserts the name of the offeree in the space provided below and only to such person." (Offering Mem. at 2.) "Pearsall Holdings" is handwritten in the "space provided below," above the words "Name of Offeree." (*Id.*)

important public policy considerations," and highlights "the fact that securities are different than other forms of commercial transactions." *Pursuit Partners, LLC v. UBS AG*, No. X05CV084013452S, 2009 WL 3286011, at *3–4 (Conn. Super. Ct. Sept. 8, 2009) (citing *Conn. Nat'l Bank v. Giacomi*, 242 Conn. 17, 66 (1997)). Indeed, the statute explicitly mandates that "[a]ny condition, stipulation or provision binding any person acquiring any security or receiving investment advice to waive compliance with any provision of [CUSA] is void." C.G.S. § 36b-29(i). For these reasons, at least one Connecticut court has concluded that "it would violate [Connecticut's] fundamental policy to give an effect to a provision that would prevent suit under CUSA." *Pursuit Partners, LLC*, 2009 WL 3286011, at *4. For all of these reasons, Connecticut law and not Utah law governs the CUSA claims.

Connecticut law also governs the remainder of Plaintiff's claims which allege common law torts. The choice of law provision here, applicable by its terms only to disputes regarding "interpretation and enforcement" of the contract, "falls squarely in the category of provisions that [Connecticut courts have held] are too narrow to permit a reading that encompasses tort, rather than contract, claims." *Benefit Concepts New York, Inc.*, 2004 WL 1737452, at *3 (distinguishing "between provisions that govern controversies 'arising out of or relating to' a contract, and those contracts that are 'governed by and construed in accordance with' the laws of a state" (internal citations omitted)). Notwithstanding Defendant Lewis's flawed position that "[t]he plain language of . . . the Agreement establish[es] . . . Utah law as the governing law for all purposes" (Reply at 1), the Agreement clearly limits the application of Utah law to disputes regarding interpretation and enforcement of the contract.

### 2.   Merger Clause

Mr. Lewis further asserts that all of the claims against him should be dismissed because they are barred by the merger clause in the Agreement, which states:

> This Agreement and any exhibits hereto constitute the entire agreement and understanding of the parties hereto with respect to the matters herein set forth, and all prior negotiations, writings, and understandings relating to the subject matter of this Agreement are merged herein and are superseded and canceled by this Agreement.

(Investment Agreement § 8(b) at A-7.)   Because this language is clear and specific, Defendant Lewis argues, curiously citing to New York law, that Plaintiff cannot base its claims on statements made by Defendants prior to the execution of the Agreement. (Mem. Supp. Mot. to Dismiss [Doc. # 87-4] at 8–9; Reply at 10–13.)

However, as Plaintiff notes, "[i]t is well settled under Connecticut law that parol evidence is admissible to show fraud or misrepresentation." *Woodling v. Garrett Corp.*, 813 F.2d 543, 554 (2d Cir. 1987); *see Perricone v. Perricone*, 292 Conn. 187, 192 (2009) (finding that parol evidence may be introduced in spite of a merger clause "to show mistake or fraud."). Because all of Plaintiff's claims are premised on its assertion that Mr. Lewis engaged in misrepresentations to induce Plaintiff's investment, the merger clause does not operate to bar Plaintiff's claims here.

### B.   Counts One and Two, CUSA §§ 36b-29(a), 36b-29(c)

Section 36b-29(a)(2) of CUSA gives buyers a right of action against:

> Any person who . . . [1] offers or sells or materially assists any person who offers or sells a security [2] by means of any untrue statement of a material fact or any omission to state a material fact . . . [3] who knew or in the exercise of reasonable care should have known of the untruth or omission, [4] the buyer not knowing the untruth or omission. . . .

11

C.G.S. § 36b-29(a)(2).  Subsection (c) extends liability to "[e]very person who directly or indirectly controls a person liable under subsection[] (a)."  *Id.* § 36b-29(c).  Mr. Lewis challenges Plaintiff's claims with respect to elements one, two, and three of subsection (a) as well as under subsection (c).[9]

### 1. Element One: a person who "offers or sells or materially assists any person who offers or sells a security"

Mr. Lewis contends that Plaintiff's CUSA claims fail to demonstrate that he or any of the defendants offered or sold Plaintiff a security because the Offering Memo was a solicitation (Mem. Supp. at 12) or was neither a solicitation nor an offer (Reply at 1–3). However, as discussed *supra*, Defendant's claim that the Memo was neither a solicitation nor an offer lacks merit, and whether it was an offer or solicitation, it is covered by CUSA. *See* C.G.S. § 36b-3(16)(B).

Defendant Lewis argues in the alternative that Plaintiff failed to put forth sufficient factual allegations to state a claim against him personally because he neither signed the Agreement nor materially assisted Mountain High in offering or selling a security.  (Reply at 5.)  The Connecticut Supreme Court defines aid as material "if it 'has a natural tendency to influence, or was capable of influencing, the decision of' the purchaser."  *Giacomi*, 242 Conn. at 52–53 (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988)).  The court explained that "the 'statement itself need not be considered in isolation rather than in the context of the total presentation.  A seemingly innocuous oral

---

[9] Because Plaintiff's SAC fails to state a claim under element two, the Court does not reach element three or subsection (c).

communication not containing affirmative misrepresentations may violate [CUSA] if it is used to emphasize, or induce reliance on, some other representation that is false or misleading.'" *Id.* at 53 (quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 361 (2d Cir. 1992), *abrogated on other grounds as noted in Yung v. Lee*, 432 F.3d 142, 147 (2d Cir. 2005)).

Under this standard, Plaintiff's allegations suffice to state a claim of material assistance against Defendant Lewis.  Plaintiff asserts that Defendant Lewis and others persuaded it to invest by telling it they had a buyer and backup buyers for the bond (2d. Am. Compl. ¶ 11); that Defendant Lewis participated in "5 to 6 telephone calls and conference calls over about 4 weeks" following the first call with Mr. Pearsall in 2010 (*id.* ¶ 13); that during these calls, Defendant Lewis and others reiterated their claims that they had a buyer, emphasized the accuracy of the actuarial science upon which they relied, and represented that Defendant Lewis was an attorney and was working on the deal along with attorneys at Vedder Price, that Oppenheimer was involved in the deal, and that Mr. Riviere "had experience with these deals before" (*id.* ¶ 14); that Defendant Lewis communicated with Mr. Pearsall's attorney in further attempts to solicit an investment from Plaintiff (*id.* ¶ 15); and that Defendant Lewis "acknowledged and confirmed receipt of" Plaintiff's investment (*id.* ¶ 31).  These allegations, if true, could lead a reasonable factfinder to conclude that Defendant Lewis materially assisted in the sale of securities to Plaintiff.

### 2. Element Two: "by means of any untrue statement of a material fact or any omission to state a material fact"

Defendant Lewis argues that Plaintiff does not state with adequate specificity what misstatements or omissions Mr. Lewis allegedly made. (Mem. Supp. at 3–5, 11.) As Defendant Lewis notes, under Rule 9(b), "[i]n alleging fraud . . . , a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). According to Defendant Lewis, Plaintiff's Second Amended Complaint ("SAC") is insufficient to satisfy this standard because it (1) does not specify which statements were made by Defendant Lewis as opposed to the other individual Defendants, and (2) does not specifically allege which statements were false.

"Rule 9(b) is not intended to be an insurmountable hurdle for [claimants] to overcome, but was designed to afford defendants fair notice of the fraud alleged against them. The complaint must give the party adequate notice of the charges—it need not marshall all the evidence against him." *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, No. 94 CIV. 8301(JFK), 1995 WL 608323, at *3 (S.D.N.Y. Oct. 16, 1995) (internal quotation marks and citations omitted). Thus, a complaint governed by Rule 9(b) must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach*, 355 F.3d at 170.

The requirement that the speaker be identified precludes complaints which vaguely attribute allegedly fraudulent statements to "defendants." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). However, where a group of

defendants is alleged to be liable for fraud, a plaintiff is "not expected to pinpoint precisely who uttered the statements;" she need only "inform each defendant of the nature of his alleged participation in the fraud." *In re AnnTaylor Stores Sec. Litig.*, 807 F. Supp. 990, 1004 (S.D.N.Y. 1992). The rationale for this rule is that "a plaintiff may not be able to plead the precise role of each defendant when a group of defendants has acted in concert to cause the complained of injury. Under those circumstances, it is appropriate to plead the actions of the group and leave development of individual liability questions until some discovery has been undertaken." *Philip Morris Inc. v. Heinrich*, No. 95 CIV. 0328 (LMM), 1997 WL 781907, at *10 (S.D.N.Y. Dec. 18, 1997) (alterations omitted) (quoting *In re AnnTaylor Stores Sec. Litig.*, 807 F. Supp. at 1005); *see Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987) ("the degree of particularity required should be determined in light of such circumstances as whether the plaintiff has had an opportunity to take discovery of those who may possess knowledge of the pertinent facts."). In this case, Plaintiff's failure to identify which individual of a small group of people said which statement during phone calls in which they all participated is not a ground for dismissal.

In contrast, Plaintiff's failure to specifically allege which statements or omissions were allegedly untrue is a ground for dismissal.[10] Plaintiff's SAC and oral argument suggest that Plaintiff believes that there were never any buyers "lined up" or "waiting in

---

[10] In Plaintiff's Opposition, and at oral argument, Plaintiff stated, citing to ¶¶ 11, 14, 26, 27–28, 34–35, Count Three ¶ 43, and Count Four ¶ 43 of the SAC, that "Pearsall Holdings alleges that Lewis made representations and stood by while others misrepresented that a buyer had been found and backup buyers were lined up." (Opp'n at 25.) However, neither the cited paragraphs nor any other paragraph in the SAC alleges (except in vague and conclusory fashion) that Defendants' statements about a buyer were "misrepresentations" or were false statements at the time made.

the wings," but the SAC never states so explicitly, and the statements in the SAC from which such a claim could be inferred lack the specificity required by Rule 9(b).  The closest the SAC gets to identifying fraudulent statements or omissions is in the following allegations:

- "The Individual Defendants . . . made representations that there **was a buyer already lined up** to purchase the life settlement bonds, with backup buyers in the wings.  They stated that Riviere was doing due diligence on the buyer to comply with the Know Your customer Rule." (2d Am. Compl. ¶ 11 (emphasis added).)
- "[T]he Individual Defendants explained that Pearsall Holdings would be replacing a current investor who needed to withdraw, and expressed the **urgency** and necessity of Pearsall Holdings' investment." (*Id.* (emphasis added).)
- "[D]uring a series of about 5 to 6 telephone and conference calls over about 4 weeks," "each of the Individual Defendants . . . explained the mechanics and the **accuracy of the underlying actuarial science** [and] . . . made additional assurances that they **had a buyer and backup buyers** for the bond in place, as well as other investors." (*Id.* ¶¶ 13–14 (emphasis added).)
- "The Individual Defendants told David Pearsall in telephone calls and the Offering Memorandum and the Investment Agreement stated that, in exchange for an investment, Mountain High **would pay an amount equal to the investment plus a four times return** on the investment." (*Id.* ¶ 25 (emphasis added).)
- "Prior to making an investment, the Individual Defendants made representations and assurances to David Pearsall that Mountain High and Riviere **had a buyer and potential backup buyers already lined up** for the purchase of a life settlement bond, and that as a result, Pearsall Holdings would only be out of its $750,000 for **45 to 90 days**." (*Id.* ¶ 27 (emphasis added).)
- "The Individual Defendants . . . told [Mr. Pearsall] that he would have **$3 million in 45 to 90 days**." (*Id.* (emphasis added).)
- "The Individual Defendants' representations, promises and assurances that **there was a buyer for the bond** negated statements in the Offering Memorandum to the effect that there could be a

loss of investment if there was no buyer for the bond." (*Id.* ¶ 28 (emphasis added).)

- "Starting in July 2010, when David Pearsall would check on the status of the sale of the bond, Defendants Blue and Lewis sent emails claiming that they were negotiating with buyers **other than the buyers they said they had lined up** before the investment." (*Id.* ¶ 34 (emphasis added).)

- "The Individual Defendants and Mountain high Finance offered or sold . . . a security to Pearsall Holdings by means of untrue statements of material fact or omissions to state a material fact by virtue of the **various representations and assurances Individual Defendants made to David Pearsall** during telephone conversations." (*Id.* ¶ 47 (emphasis added).)

Reading these allegations together, one could reasonably infer that there was never any buyer from: Defendants' statements about the accuracy of the underlying actuarial science, their urgency in getting Plaintiff's investment, their multiple assurances that they had a buyer and backup buyers in place, their promises that Plaintiff would quickly receive a large return on its investment, and the short period of time between June 2010 when Plaintiff made its investment in reliance on Defendants' statements regarding having a buyer and July 2010 when Defendant Lewis claimed to be "negotiating with buyers other than the buyers they said they had lined up before the Investment" (*id.* ¶ 34). These allegations suffice to state a plausible claim against Defendant Lewis under Rule 8(a).

However, they are not sufficient to satisfy the pleading requirements of Rule 9(b) because they fail to plead "the circumstances constituting fraud or mistake" with particularity, Fed. R. Civ. P. 9(b), or to identify "what is false or misleading about the purportedly fraudulent statement[s], and why it is false," *Cafasso*, 637 F.3d at 1055

(internal quotations marks and brackets omitted).  Illustrative caselaw provides support for this conclusion.

In *Boritzer v. Calloway*, the plaintiffs alleged that the defendants solicited funds from them (which they paid via wire transfer) by means of material misrepresentations that the money would be used to create new successful restaurants.  No. 10 CIV. 6264 (JPO), 2013 WL 311013, at *7 (S.D.N.Y. Jan. 24, 2013).  The plaintiffs claimed "that Defendants never intended to pay them back, and instead took their money in bad faith, with no concrete plans to open the claimed Manhattan restaurants."  *Id.*  To support this claim, the plaintiffs' complaint put forth "(1) the dates of the wire transfers; (2) the dates of the meetings with Defendants; (3) the statements Defendants made, including those in which Defendants insisted upon wire transfers to the Company account;" (4) the fact that plaintiffs' "monies were never repaid;" and (5) the fact that "five other Bernard-Calloway restaurant ventures failed under suspicious circumstances."  *Id.* at *7–8.  The court held that although the claim may have been plausible, it did not satisfy Rule 9(b)'s particularity requirements because "Plaintiffs never specifically allege[d] how in fact Defendants' statements and representations were part of a scheme to defraud, rather than merely bad business advice."  *Id.* at *8.

Likewise, here, Plaintiff fails to either directly allege that there was never a buyer or to allege facts from which a strong inference that there was never a buyer can be drawn.  Like the claims put forth by the plaintiffs in *Boritzer*, "[a]t bottom, Plaintiffs' assertions of a scheme to defraud are rooted in speculation about the circumstances of their lost investment . . . , rather than allegations sounding in a particularized narrative of wrongdoing."  *Id.*  "To put it bluntly, there are any number of reasons that a[n]

18

[investment in a new market] might fail, and to survive a motion to dismiss, fraud must constitute more than a speculative explanation for what is plausibly no more than a failed business venture." *Id.* at *9. *Compare Liaros v. Vaillant*, No. 93 CIV. 2170 (CSH), 1996 WL 88559, at *9–11 (S.D.N.Y. Mar. 1, 1996) (dismissing claim under Rule 9(b) because "it [wa]s not clear which of [the defendants'] statements plaintiff consider[ed] fraudulent," the complaint "does not describe any of these statements as false" and "it is well nigh impossible to parse the complaint and discern which of these statements is alleged to be fraudulent in the section entitled 'First Cause of Action for Fraud.'"), *with S.E.C. v. Yorkville Advisors, LLC*, No. 12 CIV. 7728 (GBD), 2013 WL 3989054, at *5 (S.D.N.Y. Aug. 2, 2013) (declining to dismiss claim where the complaint alleged that the defendants "misrepresented the age of Yorkville's convertibles" by telling prospective investors during a July 22, 2008 conference call that "75% of Yorkville's portfolio was less than 18 months old and 90% was less than two years old" when in fact "43% of the investments were over two years old.") *and Mazza v. Berk & Michaels, P.C.*, No. 90 CIV. 4066 (SWK), 1992 WL 150381, at *2 (S.D.N.Y. June 12, 1992) (declining to dismiss claim where complaint alleged that "plaintiffs informed defendants that they desired low risk investments . . . but . . . defendants [nonetheless] put plaintiffs into high risk tax shelter partnerships, involving arbitrage, real estate and mortgage lending activities" and then "assured [them during specified meetings at specified times and places] that the . . . investment[s] w[ere] within [their] risk tolerances." (internal quotation marks omitted)). Because Plaintiff's allegations of false statements are insufficiently specific to satisfy Rule 9(b), its claims under CUSA, as well as its fraudulent and negligent misrepresentation claims also fail, as explained below.

**C. Counts Three and Four: Fraudulent and Negligent Misrepresentation**

In Connecticut, a plaintiff alleging fraudulent misrepresentation must demonstrate: "(1) [t]hat a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." *Miller v. Appleby*, 183 Conn. 51, 54–55 (1981). An action for negligent misrepresentation requires: "(1) a false representation made as a statement of fact and for the guidance of the other party; (2) failure to exercise due care on the part of the party making the statement; (3) justifiable reliance to its detriment by the harmed party." *XL Specialtiy Ins. Co. v. Carvill America, Inc.*, No. X04CV-04-4000148-S, 2007 WL 1748157, at *33 (Conn. Super. Ct., May 31, 2007).

Plaintiff's misrepresentation claims fail for the same reason its CUSA claims fail: it has not put forth sufficient facts to plausibly allege that a false representation was made as a statement of fact. Although Plaintiff claims to have alleged that Defendant Lewis made false statements in paragraphs 11, 13–14, 25, 27 of its SAC, none of these paragraphs actually make such allegations. (*See* Opp'n at 19.) Nor are, as Plaintiff conceded at oral argument, the vague and conclusory allegations in paragraphs 42[11] and 43[12] of Count Three sufficient to state a claim.

---

[11] Paragraph 42 states: "The Individual Defendants made false representations as a statement of fact by virtue of the various representations and assurances made to David Pearsall on behalf of Pearsall Holdings." (2d Am. Compl. ¶ 42.)

[12] Paragraph 43 states: "The Individual Defendants' representations and assurances were untrue and known to be untrue by Defendants." (*Id.* ¶ 43.)

### D.  Count Six: Unjust Enrichment

Unjust enrichment is a cause of action in equity that "applies wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract."  *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557, 573 (2006).  To state a claim of unjust enrichment in Connecticut, a plaintiff must plausibly allege "(1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment."  *Id.*

Defendant Lewis asserts that Plaintiff has failed to allege that Defendant Lewis individually benefited from Plaintiff's investment.  (Mem. Supp. at 14.)  However, as Plaintiff notes, the Offering Memorandum is explicit that "net proceeds from investors . . . will be used . . . to cover the anticipated administrative and professional costs of drafting necessary bond documents and contractual documents to establish the bonds and the contractual relationships described under, and to pay the fees of various service providers."  (Offering Mem. at 11; *see* 2d Am. Compl. ¶ 19) and Plaintiff alleges that Defendant Lewis served as counsel to Mountain High (*id.* ¶ 7).  Plaintiff's claim that Defendant Lewis benefited from its $750,000 investment in Mountain High is therefore plausible.

The SAC does not however allege sufficient facts to plausibly claim that Defendant Lewis *unjustly* did not repay Plaintiff its investment on demand, as Plaintiff claims, along with its failure to receive a return on its investment.  This, however, would only constitute an injustice (as opposed to just bad luck or bad judgment) if Plaintiff was cheated or misled.  Because making a bad investment is hardly uncommon, more is

needed to form a plausible claim for unjust enrichment.  Although as Plaintiff urged at oral argument, the injustice does not necessarily need to reach the level of fraud, some injustice must be alleged.   Because Plaintiff's SAC fails to identify a single misrepresentation or material omission by Defendant Lewis or any other form of injustice perpetrated by Mr. Lewis, Plaintiff's unjust enrichment claim fails.  Therefore, Count Six is dismissed.

### E.  Count Seven: Accounting

In Connecticut as elsewhere, "[c]ourts of equity have original jurisdiction to state and settle accounts, or to compel an accounting, where a fiduciary relationship exists between the parties and the defendant has a duty to render an account."  *Mankert v. Elmatco Products, Inc.*, 84 Conn. App. 456, 460 (2004) (quoting *C & S Research Corp. v. Holton Co.*, 36 Conn. Supp. 619, 621 (Super. Ct. 1980)).  In this context, "fiduciary relationship" is broadly defined to include not only "those relationships which are traditionally regarded as those of trust and confidence, but also . . . those informal relations which exist whenever one person trusts in, and relies upon, another."  *Id.*  For example, the relationship between "parties to a business agreement" has "been deemed to involve such confidence and trust so as to entitle one of the parties to an accounting in equity."  *Id.* at 460–61.  Alternatively, if there is no fiduciary relationship, an accounting may be warranted by "some other special ground of equitable jurisdiction such as fraud." *Donahue v. Barnes*, 6 Conn. Cir. Ct. 64, 65–66 (1969).

Plaintiff acknowledged at oral argument that there was no fiduciary relationship between itself and Defendant Lewis, but claims that an accounting is nonetheless appropriate here in light of its accusations of fraud.  However, given the inadequacy of

Plaintiff's fraud allegations, and Plaintiff's failure to put forth any other "special ground of equitable jurisdiction," an accounting is not warranted.

**IV.    Conclusion**

For the foregoing reasons, Defendant Lewis's Motion [Doc. # 87] to Dismiss is GRANTED.  The Clerk is directed to dismiss Defendant Lewis from the case.

IT IS SO ORDERED.

          /s/
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 18th day of December, 2014.